UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TERRENCE TERRELL MOORE,

    Petitioner,

v.           CASE NO. 08-11678
             HONORABLE ARTHUR J. TARNOW
CINDI CURTIN,

    Respondent.

_____/

## OPINION AND ORDER DENYING THE HABEAS CORPUS PETITION AND GRANTING IN PART A CERTIFICATE OF APPEALABILITY

Petitioner Terrence Moore has filed a *pro se* habeas corpus petition under 28 U.S.C. §

2254. The petition challenges Petitioner's Oakland County convictions for first-degree murder

and related offenses on grounds that (1) the verdict was against the great weight of the evidence,

(2) Petitioner's confession was involuntary, (3) the prosecutor committed misconduct, and (4)

trial counsel was ineffective. None of these claims warrant granting the writ of habeas corpus.

Accordingly, the petition will be denied.

### I. Background

**A. The Charges and Trial**

Petitioner was charged in Oakland County, Michigan with first-degree murder, second-

degree murder (as an alternative to count one), felon in possession of a firearm, larceny in a

building, and four counts of possession of a firearm during the commission of a felony. The

charges arose from the fatal shooting of Amjed Abdallah and the theft of a

piece of equipment known as a mixing board from Mr. Abdallah's music studio. Mr. Abdallah's

body was discovered in his studio on Eight Mile Road in Ferndale, Michigan about 11:00 a.m.

on January 4, 2005. The medical examiner, Dr. Bernardino Pacris, testified at Petitioner's jury

trial that Mr. Abdallah was shot six times and that he probably died late on January 2, 2005, or

early on January 3, 2005. The cause of death was multiple gunshot wounds, and the manner of

death was homicide. All the casings found at the crime scene were the same caliber, and the

bullets found at the scene could have been fired from the same gun, but no gun was recovered to

compare to the casings and bullets.

Petitioner's business card bearing the name Maddog Records was the only business card

found at Mr. Abdallah's studio, and Petitioner's fingerprint was discovered on a beer can left at

the studio. A friend of Mr. Abdallah, Dan Hess, and Mr. Abdallah's former wife, Kathleen

Hurley, testified that there were no beer cans in the studio on January 1, 2005, when they and

their children were visiting Mr. Abdallah. Vincent Muscillo, another friend of Mr. Abdallah,

testified that, after Mr. Abdallah's murder, he went to the studio and noticed that some of the

wires previously connected to the mixing board had been cut.

Eduardo Rodriguez testified that he was Petitioner's manager and that he had agreed to

pay Mr. Abdallah $500 per session to record and produce Petitioner's music. After Mr.

Abdallah produced a master compact disc for Petitioner, Mr. Rodriguez decided to stop using

Mr. Abdallah's services. He thought that he should be getting more for his money, but there

were never any hard feelings between him and Mr. Abdallah as a result of his decision to

discontinue doing business with Abdallah. Mr. Rodriguez denied shooting Mr. Abdallah,

stealing Mr. Abdallah's mixing board, or going to the studio with Petitioner after January 1, 2005. He claimed that he learned about the murder from Petitioner.

Forensic scientist Tara Reinholz of the Michigan State Police testified that Petitioner and Eduardo Rodriguez were excluded as donors of DNA found in five blood stains collected at the crime scene. The DNA of an unidentified male was present in all five blood stains, and one of the five stains was consistent with a mixture of two donors, including the unidentified male. The victim could not be excluded as the donor of the minor DNA type in that sample, and when Ms. Reinholz entered the major DNA profile into a nationwide database, she was given the name of Jonathan Lamont Welch.

Derrick Williams testified that, on January 3, 2005, he was working at Zieman's Jewelry and Loan pawn shop on Gratiot Avenue. A man called and said that he had some studio equipment he wanted to sell. The man wanted about $10,000 for the equipment. Williams responded that he could not give a quote over the telephone. Later that day, three men came to the shop and stated that they had some studio equipment outside. One of the three men had the number thirteen tattooed on his forehead. Mr. Williams remained inside and asked one of his employees, Benjamin Young, to look at the equipment. Mr. Young testified that he looked at the machine, but refused to accept it because there were no serial numbers on it. He did not remember how many people were outside, and he could not identify anyone who was at the shop that day.

Sergeant David Veasley of the Michigan State Police testified that he interviewed Petitioner two times. On January 20, 2005, he advised Petitioner of his constitutional rights, and

Petitioner waived his rights. Petitioner initially denied any knowledge of, or involvement in, the crime, and he stated that he did not witness the shooting. Petitioner later changed his story and said that Eduardo was the shooter. On January 21, 2005, Sergeant Veasley spoke with Eduardo Rodriguez and eliminated him as a suspect, and on January 22, 2005, Veasley interviewed Petitioner a second time. After Petitioner waived his constitutional rights, Sergeant Veasley informed Petitioner that the police had discovered new evidence, which indicated that Petitioner was not being totally honest. Petitioner then admitted that he had shot Mr. Abdallah and that someone named Jonathan had been with him at the time.

Detective George Hartley of the Ferndale Police Department was the officer in charge of the case. He learned that Eduardo Rodriguez had purchased an external hard drive from a music store. Detective Hartley subsequently interviewed Mr. Rodriguez, and he determined from the Oakland County crime lab that Petitioner had left his fingerprint on a beer can, which was found in Mr. Abdallah's studio. Detective Harley interviewed Petitioner about 6:00 p.m. on January 19, 2005. After Petitioner waived his constitutional rights, he informed Detective Hartley that he had learned of Mr. Abdallah's murder from his manager Ed, but that he did not know anything about the murder and that the last time he had been in Mr. Abdallah's studio was in December of 2004. When Detective Hartley advised Petitioner that his fingerprint had been found on a beer can at the studio and that the beer can was not there on New Year's Eve or on New Year's Day, Petitioner explained that he must have left his beer there when he and Eduardo went to the studio. Petitioner said that he walked out of the studio and went home when Eduardo and Mr. Abdallah got into an argument about the excessive amount of money Abdallah was charging for

the number of songs being produced.  Petitioner also told Detective Hartley that he and Ed had

removed the mixing board from the studio.  Petitioner explained that he and "Doughboy"

(Jonathan Lamont Welch) later scraped the serial number off the board and took it to Zieman's.

At the conclusion of the conversation between Detective Hartley and Petitioner, Hartley asked

Petitioner how truthful he had been.  Petitioner indicated that he had been ninety percent truthful.

On January 20, 2005, Detective Hartley took Petitioner to the Michigan State Police post

where Sergeant Veasley interviewed him.  Petitioner told Sergeant Veasley that he was in the

music studio when the first shot was fired.  He ran out the door, but returned about thirty seconds

later and saw Eduardo shoot Mr. Abdallah four or five more times.  Eduardo asked him for help

in removing the mixing board to make it look like a robbery.

On January 22, 2005, Detective Hartley once again took Petitioner to the Michigan State

Police post where Sergeant Veasley accused Petitioner of having lied to him. He asked Petitioner

whether he had shot Mr. Abdallah.  Petitioner slumped forward, nodded his head up and down,

and said, "Yes."  Detective Hartley then entered the room and reviewed the events with

Petitioner.  Petitioner admitted that "Doughboy," not Eduardo, had been with him during the

shooting.  Petitioner claimed that he shot Mr. Abdallah because Abdallah had been beating

Eduardo out of points for money.  Petitioner went on to say that, after he shot Mr. Abdallah four

to five times, he handed the gun to Doughboy and instructed Doughboy to shoot Mr. Abdallah so

that he could prove he was a "maddog" killer.  Doughboy then shot Mr. Abdallah two times.

They took the mixing board out of the studio, scraped off the serial number, and tried to pawn it

at Zieman's on the following morning. When he was unable to sell the board, he broke it into pieces and threw the gun over the Belle Isle bridge.

Petitioner later offered to show Detective Hartley where he had discarded the mixing board and gun if Hartley gave him five dollars and took him to a "crack" house so that he could purchase "crack" one last time before he went to prison. Hartley responded that he would "look into it."

Petitioner did not testify or present any witnesses at trial or at the pretrial evidentiary hearing on the voluntariness of his confession. His defense was that he was questioned until he made a confession and that the prosecution did not prove its case beyond a reasonable doubt.

## B. The Verdict, Sentence, and Appeal

On November 7, 2005, the jury found Petitioner guilty of first-degree (premeditated) murder, Mich. Comp. Laws § 750.316(1)(a), felon in possession of a firearm, Mich. Comp. Laws § 750.224f, larceny in a building, Mich. Comp. Laws § 750.360, and three counts of felony firearm, Mich. Comp. Laws § 750.227b. Petitioner then pleaded guilty to being a habitual offender, fourth offense. Petitioner was sentenced to two years in prison for the felony firearm convictions, followed by concurrent terms of life imprisonment for the murder, six to forty years for being a felon in possession of a firearm, and three to fifteen years for larceny in a building.

Petitioner moved for a new trial on the ground that the evidence was insufficient and the jury's verdict was against the great weight of the evidence. He also sought an evidentiary hearing to establish his trial attorney's ineffectiveness. The trial court denied both motions at a

hearing held on August 9, 2006, and the Michigan Court of Appeals subsequently affirmed Petitioner's convictions in an unpublished, *per curiam* opinion.  *See People v. Moore*, No. 268465, 2007 WL 1687550 (Mich. Ct. App. June 12, 2007).  On November 29, 2007, the Michigan Supreme Court denied leave to appeal.  *People v. Moore*, 480 Mich. 952; 741 N.W.2d 362 (2007) (table).

### C.  The Habeas Petition and Answer

Petitioner filed his habeas corpus petition on April 21, 2008.  He raises the same claims that he presented to the state courts.  Respondent argues in an answer to the petition that Petitioner's prosecutorial-misconduct claim is procedurally defaulted and that his great-weight-of-the-evidence claim does not state a basis for granting habeas relief.  Respondent contends that the state court's adjudication of Petitioner's other claims regarding his confession and trial attorney was reasonable.

## II.  Standard of Review

Section 2254(d) of Title 28, United States Code, imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application occurs" when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

### III. Discussion

#### A. Weight and Sufficiency of the Evidence

Petitioner alleges that the jury's verdict was contrary to the great weight of the evidence. Although Petitioner's fingerprint and business card were found at the scene of the crime, Petitioner contends that those items carry little weight because he was one of Mr. Abdallah's customers and because he readily admitted to being at the music studio during the month before the crime. Petitioner also points out that Jonathan Welch's blood, not his, was found at the crime scene. The Michigan Court of Appeals adjudicated Petitioner's claim on the merits and concluded that the evidence did not preponderate against the jury's verdict and that the trial court properly denied Petitioner's motion for a new trial.

The contention that the weight of the evidence did not support the jury's verdict is not a cognizable claim on habeas corpus review because it is a state-law argument, and a federal habeas court is only allowed to review issues of federal law. *Nash v. Eberlin*, 258 Fed. Appx. 761, 764 n.4 (6th Cir. 2007). Even if the Court were to construe Petitioner's claim as a challenge to the sufficiency of the evidence adduced at trial, the claim would lack merit for the following reasons.

When reviewing a sufficiency-of-the-evidence claim, a habeas court must examine "the evidence in the light most favorable to the prosecution" to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original). "'Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.'" *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006) (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)).

Petitioner has not alleged that the prosecutor failed to prove each element of the crimes charged. The only dispute is whether Petitioner was responsible for the crimes. His fingerprint was discovered on a beer can, which was found at the crime scene, and although Petitioner claims that this evidence carries no weight, two witnesses testified that the beer can was not present on the day before the murder. (Tr. Nov. 1, 2005, at 228, 234-35, 243, 247, and 257.) There was additional evidence that Mr. Abdallah's mixing board was stolen from the studio and that Petitioner was one of three individuals who tried to pawn a mixing board on the day after the murder. (Tr. Nov. 4, at 43-44.)

Finally, Petitioner's own confession to the police included admissions that he shot Mr. Abdallah four or five times and then handed the gun to Jonathan Welch and encouraged Welch to shoot Abdallah. Petitioner also admitted to the police that he and Welch removed Mr. Abdallah's mixing board from the studio and discarded it when they were unsuccessful at the pawn shop. The discovery of a drop of Welch's blood at the crime scene corroborated Petitioner's admissions.[1]

A rational juror could have concluded from the evidence that Petitioner was guilty of possessing a firearm, of using the gun to murder Amjed Abdallah, and of stealing Mr. Abdallah's mixing board. Because the parties stipulated that Petitioner had a prior felony conviction, a rational juror also could have concluded that Petitioner was guilty of being a felon in possession of a firearm. Petitioner's claim therefore has no merit.

**B. The Confession**

Petitioner alleges next that his confession was not voluntarily made because he was subjected to three days of intensive interrogations which drove him to the point of emotional and physical exhaustion. Petitioner asserts that he suffers from mental illness, which made him vulnerable to psychological coercion.

**1. Legal Framework**

The test for voluntariness of a confession is whether

"the confession [was] the product of an essentially free and unconstrained choice by its maker[.] If it is, if he has willed to confess, it may be used against him. If

---

[1] The prosecutor speculated that Welch cut himself when he and Petitioner slashed the wires on the mixing board and removed it from the studio.

it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process."

*Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973) (quoting *Culombe v. Connecticut,* 367

U.S. 568, 602 (1961)).  When determining whether a defendant's will was overborne in a

particular case, courts must assess

> the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation.  Some of the factors taken into account have included the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.

*Id*. at 226 (citations omitted).  Courts must "determine[] the factual circumstances surrounding

the confession, assess[] the psychological impact on the accused, and evaluate[] the legal

significance of how the accused reacted."  *Id*. (citing *Culombe*, 367 U.S. at 603).

"[A] defendant faces an uphill climb when, as here, he argues that a confession was

involuntary even though he properly received and waived his *Miranda* rights."  *Simpson v.

Jackson*, 615 F.3d 421, 432 (6th Cir. 2010).  "[T]he facts of a given interview must be especially

egregious to lead to the conclusion that a state court's application of Supreme Court

involuntariness case law was unreasonable for purposes of habeas relief . . . ."  *Id*.  A reviewing

court must defer to the trial court's determination of the credibility of witnesses at a suppression

hearing.  *Ramonez v. Berghuis*, 490 F.3d 482, 490 (6th Cir. 2007).  A federal habeas court has

"no license to redetermine credibility of witnesses whose demeanor has been observed by the

state trial court, but not by them."  *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983).

## 2. The Facts

The record indicates that Petitioner was arrested on January 19, 2005, and transported to the Ferndale Police Department at approximately 3:00 p.m. At 6:00 p.m. Detective George Hartley of the Ferndale Police Department advised Petitioner of his *Miranda*[2] rights. Petitioner waived his rights and gave an oral and written statement. The interview lasted about three hours. Petitioner initially denied any knowledge of the murder, but later stated that he was present at the studio. He thought that his manager, Eduardo Rodriguez, was responsible for the murder.

On January 20, 2005, Detective Hartley transported Petitioner to the Michigan State Police post in Oak Park where Sergeant David Veasley advised Petitioner of his *Miranda* and polygraph rights. Petitioner said that he was willing to talk and to take a polygraph test. During the course of the interview, which lasted about one hour, Petitioner informed Sergeant Veasley that he observed Eduardo Rodriguez shoot the victim. Petitioner claimed that he left the building, returned, and saw Eduardo shoot the victim again.

After making this admission, Sergeant Veasley left the room. Detective Hartley then entered the room and asked for more details. Petitioner was "shook up" or upset, but, according to Detective Hartley, he was coherent and he appeared to be fine. No polygraph examination was administered, and Petitioner was transported back to the Ferndale Police Department. Detective Hartley then advised Petitioner of his rights, and Petitioner agreed to talk without an attorney present. At the conclusion of the oral interview, Petitioner made a written statement. This interview lasted about two hours.

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

There were no interviews on January 21, 2005. However, on January 22, 2005, Petitioner was taken back to the state police post and advised of his constitutional rights. He indicated that he was willing to talk, and he proceeded to tell Sergeant Veasley that he was the shooter. The interview lasted about an hour. He was emotional and appeared to be a defeated man, but he was not so emotionally distraught that he could not carry on an intelligent conversation. No polygraph examination was given. Instead, Sergeant Veasley left the room, and Detective Hartley entered the room. Petitioner agreed to provide a written statement, but he stated that he preferred to do it at the Police Department. On the way back to the Police Department, Detective Hartley picked up some fast food. He and Petitioner ate lunch at the Police Department where Petitioner wrote out his statement.

After Petitioner was returned to his cell, Detective Hartley asked him about the mixing board, which Petitioner had said he destroyed. A few hours later, Petitioner asked to speak with Detective Hartley and offered to show the officers where he had disposed of the gun and mixing board if Hartley gave him money and took him to a "crack" house so that he could do "crack" one more time. Detective Hartley agreed to check into that. Petitioner later volunteered to show the officers where he disposed of the mixing board. He then guided the officers to a house and to Belle Isle.

### 3. The State Courts' Rulings

The trial court determined at the conclusion of the pretrial evidentiary hearing that the officers' interrogation of Petitioner was not unduly long and that there were no unnecessary delays before the interviews. The trial court found the State's witnesses to be credible,

particularly on the issue of whether Petitioner's ability to respond to questions was hampered during the interview. The court noted that, at each and every critical juncture in the interview, Petitioner was advised of his constitutional rights, he understood those rights, and he waived his right to remain silent. The court determined that Petitioner never asked for a lawyer, was not intoxicated or under the influence of drugs, was not threatened or promised anything, was not deprived of nutrition, drink, or sleep, was not in pain, was not abused, and was not exhausted physically or mentally. The court concluded that Petitioner's statements were the free and unconstrained choice of the maker, that Petitioner's will was not overborne, and that his capacity for self determination was not critically impaired.

The Michigan Court of Appeals deferred to the trial court's evaluation of the witnesses' credibility. The Court of Appeals determined that the police properly informed Petitioner of his constitutional rights and that, absent any evidence that the police psychologically coerced Petitioner or physically harmed him, he failed to establish that he was incapable of understanding his *Miranda* rights or that his statements were the product of police coercion.

### 4. Analysis

The state courts' findings and conclusions are supported by the record. Petitioner was thirty-six years old at the time of his interrogation, and he had earned the equivalent of a high school diploma. He had three prior convictions, and he was advised of his constitutional rights before each interview. He waived his rights according to the undisputed testimony of the officers, and he was not physically punished, nor deprived of food or sleep.

One factor that suggests Petitioner's confession may have been coerced is the fact that he was interrogated for several hours and was confined for a few days before he confessed. Taken by itself, this factor could support Petitioner's allegation of coercion, but courts

> apply a totality-of-circumstances test in this area, not a singular-fact test, and that makes all the difference. "[I]nterrogations of great[ ] duration" have been deemed improper only when "they were accompanied . . . by other facts indicating coercion." *See Berghuis v. Thompkins*, __ U.S. __, 130 S. Ct. 2250, 2266, 176 L. Ed. 2d 1098 (2010). And it is not even clear that a 24-hour interrogation amounts to one of "great[ ] duration."

*United States v. Williams*, 612 F.3d 417, 422 (6th Cir. 2010).

The record indicates that Petitioner was treated fairly and humanely, that he was repeatedly advised of his Miranda rights, and that he waived his rights. The interviews occurred over the span of four days, and each time, only one officer was present with Petitioner. The officers maintained that they did not threaten Petitioner or promise him anything, and there is no evidence of mistreatment even though Petitioner maintains that he was injured while in police custody.

Petitioner claims that he was depressed, in need of medication, suffering from schizophrenia psychosomatic disorder and bipolar disorder, and is mildly mentally challenged. The forensic examiner's reports on competency to stand trial and criminal responsibility offer some support for Petitioner's allegation that he suffered from mental illness. The examiner, however, noted that Petitioner had exaggerated his symptoms in the past and appeared to be doing the same thing during his interview with Petitioner. And even though Petitioner had previously been described as being borderline intelligent, the examiner thought that Petitioner's

vocabulary and general knowledge of current events was consistent with a higher level of intellectual ability.

Furthermore, Detective Hartley testified at trial that Petitioner's parole officer and family were consulted after Petitioner's arrest and that his medications were filled and dispensed to him according to the directions. Although the record is unclear as to how soon Petitioner was given his medications following his arrest, the officers who interviewed Petitioner maintained that he appeared to be fine; he was coherent and intelligible throughout the interviews, and he never exhibited strange or aberrant behavior. Detective Hartley testified that no polygraph was given on one of the days because Petitioner had become upset, but Sergeant Veasley claimed that the polygraphs were cancelled due to Petitioner's admissions.

The totality of the circumstances suggests that Petitioner's will was not overborne, nor his capacity for self-determination critically impaired. Consequently, the state appellate court's conclusion – that Petitioner's statements were not a product of police coercion – was not contrary to, or an unreasonable application of, Supreme Court precedent. Petitioner has no right to relief on the basis of his challenge to the use of his confession.

## C. The Prosecutor

Petitioner claims that the prosecutor engaged in misconduct by eliciting irrelevant sympathy testimony, by appealing to the jury's sympathy during closing arguments, and by referring to Petitioner's alias, "Terry Maddog 13." The Michigan Court of Appeals reviewed this claim for "plain error," because Petitioner did not raise timely objections at trial. Respondent therefore argues that the claim is procedurally defaulted. Procedural default is not a

jurisdictional limitation, *Pudelski v. Wilson*, 576 F.3d 595, 606 (6th Cir. 2009), *cert. denied*, __ U.S. __, 130 S. Ct. 3274 (2010), and Petitioner's claim lacks merit. Thus, there is no need to consider whether Petitioner's claim is procedurally defaulted.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review," *Millender v. Adams,* 376 F.3d 520, 528 (6th Cir. 2004), and may be examined for harmless error, *Bates v. Bell,* 402 F.3d 635, 641 (6th Cir. 2005). To prevail on his claim, Petitioner must demonstrate that the prosecutor's conduct and remarks, taken in the context of the entire trial, were prejudicial and infected the trial with such unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974). To obtain relief, the prosecutor's conduct must have been improper and "'so flagrant as to render the entire trial fundamentally unfair.'" *Johnson v. Bagley,* 544 F.3d 592, 597 (6th Cir. 2008) (quoting *Gillard v. Mitchell,* 445 F.3d 883, 897 (6th Cir. 2006)). Courts consider the following four factors when deciding whether a prosecutor's improper acts were sufficiently flagrant to warrant reversal: "(1) whether the evidence against the defendant was strong[;] (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally." *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (citing *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)).

**1. Eliciting Sympathetic Testimony**

Petitioner contends that the prosecutor elicited irrelevant sympathy testimony by asking two prosecution witnesses about their friendship with Amjed Abdallah. Dan Hess described his

activities with Mr. Abdallah and Abdallah's family from December 30, 2004, through January 1, 2005. (Tr. Nov. 1, 2005, at 222-29.) Vincent Muscillo described his friendship with Mr. Abdallah and testified that Abdallah was one of the nicest people he knew. (*Id*. at 264-71.)

Hess's testimony was relevant to the extent that it explained how he knew the beer can containing Petitioner's fingerprint was not present on the day before the murder. Although the other details about Hess's and Muscillo's activities and friendship with Mr. Abdallah were largely irrelevant, the testimony did not infect the trial with such unfairness as to deprive Petitioner of due process. Thus, the prosecutor did not engage in misconduct by eliciting the testimony.

### 2. Closing Argument

Petitioner complains that the prosecutor stated during closing arguments that Mr. Abdallah was a man of tremendous talent, who had helped budding young musicians. (Tr. Nov. 4, at 154.) A prosecutor may not make closing remarks that are wholly irrelevant to any facts or issues in the case for the purpose of arousing the jury's passions or prejudice. *Viereck v. United States*, 318 U.S. 236, 247-48 (1943). "[A] prosecutor illicitly incites the passions and prejudices of the jury when he calls on the jury's emotions and fears – rather than the evidence – to decide the case." *Johnson v. Bell*, 525 F.3d 466, 484 (6th Cir. 2008).

Whether Mr. Abdallah was a talented and helpful person was not relevant to the issue of Petitioner's guilt or innocence. The prosecutor, however, was not required to present a closing argument devoid of all passion, *Byrd v. Collins*, 209 F.3d 486, 532 (6th Cir. 2000) (quoting

*Williams v. Chrans*, 945 F.2d 926, 947 (7th Cir. 1991)), and he did not encourage the jury to convict Petitioner on the basis of sympathy for Mr. Abdallah.

Even if the remark was improper, it was a fleeting comment, which was not "so egregious as to render the trial fundamentally unfair." *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982). Given the evidence against Petitioner and the "stringent standards applicable on habeas review," *Byrd* , 209 F.3d at 539), the alleged error was harmless. Therefore, Petitioner is not entitled to relief on the basis of the prosecutor's closing remark about Mr. Abdallah.

### 3. References to Petitioner's Alias

The more serious allegation about the prosecutor is that he read Mr. Moore's alias or nickname ("Terry Maddog 13") to prospective jurors during *voir dire*. A prosecutor violates the defendant's right to due process when he or she refers to the defendant as a mad dog that must be put to death. *Miller v. Lockhart*, 65 F.3d 676, 683-85 (8th Cir. 1995). However, merely referring to the defendant as a mad dog does not rise to the level of a due process violation warranting habeas corpus relief. *Pacheco v. Hocker,* 295 F. Supp. 829, 832 (D. Nev. 1968). In this case, moreover, the prosecutor did not call Petitioner a mad dog. He merely read the criminal information, which states that Petitioner was also known as "Terry Maddog 13." (Tr. Oct. 31, 2005, at 138; Tr. Nov. 1, 2005, at 26.)

The "Maddog" alias and number thirteen tattooed on Petitioner's forehead caused one prospective juror to say that Petitioner was starting out "in a bad light." The juror stated that he probably could not set aside his initial reaction and hold the prosecution to his burden of proof. The trial court, however, excused that juror (Tr. Oct. 31, 2005, at 154-56), and, as the Michigan

Court of Appeals recognized, evidence of Petitioner's alias was admissible to establish identity and to connect Petitioner to the charged offenses:

> Defendant's business card from "Maddog Records" was found at the scene. Defendant confessed that he instructed Welch to shoot Abdallah to prove his loyalty as a "Maddog" killer. Muscillo testified that a man with the number 13 tattooed on his forehead came into Abdallah's studio on New Year's Eve. Derek Williams testified that a man with the number 13 tattooed on his forehead came into Zieman's pawnshop on January 3, 2005, and tried to sell a stolen mixing board.

*Moore*, 2007 WL 1687550, at *5.

The Court concludes that the prosecutor's brief references to Petitioner as "Terry Maddog 13" during *voir dire* did not rise to the level of a due process violation warranting federal habeas corpus relief. The prosecutor's conduct and comments were not improper and even if they were, the misconduct was not so flagrant as to deprive Petitioner of a fair trial.

## D. Trial Counsel

Petitioner's fourth and final claim alleges that his trial attorney provided ineffective assistance. The Michigan Court of Appeals found no merit in this claim. To establish ineffective assistance of counsel, Petitioner must demonstrate that his attorney's "performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 U.S. 668, 687 (1984). The "deficient performance" prong requires showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. The "prejudice" prong requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

**1. Failure to Object to the Prosecutor's Conduct**

Petitioner contends that his attorney should have objected to the prosecutor's introduction of his alias and to the prosecutor's use of irrelevant sympathy testimony and remarks. The prosecutor's conduct and remarks either were not improper or were not flagrant, and Petitioner's "attorney [was] not constitutionality deficient for failing to lodge a meritless objection." *Northern v. Boatwright*, 594 F.3d 555, 561 (7th Cir. 2010), *cert. denied*, __ U.S. __, 131 S. Ct. 143 (2010).

**2. Failure to Investigate and Object to Police Coercion**

Petitioner alleges next that his trial attorney was ineffective for failing to investigate and produce evidence of police coercion at the pretrial evidentiary hearing on the voluntariness of his confession. "Counsel's duty to investigate has been repeatedly reaffirmed by the Supreme Court," *Poindexter v. Booker*, 301 Fed. Appx. 522, 528 (6th Cir. 2008), and the Court of Appeals for the Sixth Circuit has "granted *habeas* relief when counsel failed to investigate." *Id.* "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690-91. "The focus in failure-to-investigate claims, then, is the reasonableness of the investigation (or lack thereof)." *English v. Romanowski*, 602 F.3d 714, 726 (6th Cir. 2010) (citing *Wiggins v. Smith*, 539 U.S. 510, 527 (2003)).

### a. Physical Injury

Petitioner alleges that his attorney should have presented medical records, which would have established that he was injured while in police custody.  Although exhibits to the habeas petition indicate that Petitioner complained about having sore ribs on January 28, 2005, while he was in jail, there is no evidence that the police mistreated him after he was taken into custody or while he was interrogated.  In fact, Petitioner reported to the nurse that he had a physical altercation with the police at the time of his arrest.  He claimed that he was pushed, fell over a wall, and hurt his rib.  An x-ray was taken of his ribs on January 31, 2005, but the radiologist found no fracture or abnormality, and Police Officer David Spellman testified at the pretrial evidentiary hearing that Petitioner was cooperative when he was arrested and did not appear to be in any pain.  (Tr. Oct. 31, 2005, at 21-22.)  Sergeant David Veasley testified that, during his interview with Petitioner, Petitioner did not complain of any pain or of being physically abused. (*Id*. at 39.)  Detective George Hartley also testified that Petitioner did not appear to be bruised or in any pain.  (*Id*. at 66.)

There is no evidence in the record to support the contention that Petitioner's alleged injury resulted in a coerced confession.  Therefore, trial counsel appears to have made a reasonable decision that an investigation was unnecessary.

### b. Mental Illness

Petitioner also contends that his attorney should have presented testimony at the evidentiary hearing that he suffers from a host of mental incapacities, including depression, schizophrenia, bipolar disorder, retardation, and a closed head injury.  Petitioner claims that he

was not given his anti-psychotic medication during the three days of interrogation leading to his confession. In addition, Petitioner contends that his attorney should have argued that Petitioner was suffering from cocaine withdrawal.

The Michigan Court of Appeals stated on review of this claim that:

> [c]ontrary to defendant's argument on appeal, it appears that trial counsel investigated whether to challenge the voluntariness of defendant's confession to the police based on mental illness. [A]n independent examiner with the Forensic Center conducted a psychological evaluation and trial counsel requested the appointment of a defense expert to examine defendant. Although an independent examination was conducted and defendant allegedly had preexisting, prediagnosed mental conditions, defendant's appellate counsel failed to present any medical records to support this claim in the motion for new trial in the trial court.

*Moore*, 2007 WL 1687550, at *6. The Court of Appeals presumed from the record that "there [were] no medical records or psychological evaluations that would assist the defense to establish that defendant was coerced into making a confession while in a mentally impaired state." *Id.*

The Supreme Court has said that, "while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." *Colorado v. Connelly*, 479 U.S. 157, 165 (1986). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id.* at 167; *see also United States v. Macklin*, 900 F.2d 948, 951-52 (6th Cir. 1990) (concluding that the defendants' confessions were voluntary even though both defendants were considered mildly retarded, because there was no evidence that the defendants did not understand the consequences

of their actions or that federal agents engaged in overreaching or exerted any coercion on the defendants).

In this case, there is some evidence of mental illness, but no evidence of coercive police activity. Exhibits to the habeas petition include two reports from a licensed psychologist who interviewed Petitioner on March 12, 2005, for the purpose of determining criminal responsibility and competency to stand trial. The reports confirm that, in the past, Petitioner had been considered borderline intelligent and had been diagnosed with bipolar disorder and schizophrenia. The psychologist noted, however, that Petitioner had exaggerated his psychiatric symptoms in the past and appeared to feign and exaggerate his psychiatric disturbance during the interview. The psychologist concluded that Petitioner was competent to stand trial and that Petitioner should be regarded as responsible, but mentally ill, with respect to each of the charged offenses.

Trial counsel presumably could have used the psychologist's reports to argue that Petitioner was mentally ill when he was interrogated. By all accounts, however, Petitioner was treated humanely during his detention and interviews with the police. Furthermore, Police Officer David Spellman testified at the pretrial evidentiary hearing that Petitioner did not exhibit any strange behavior at the time of his arrest (Tr. Oct. 31, 2005, at 22), and Sergeant David Veasley testified that Petitioner answered his questions appropriately, did not display any aberrant or strange behavior, and did not express any confusion during his interview with Petitioner. (*Id.* at 31.) Detective George Hartley admitted that Petitioner appeared emotional after he made an admission during one of the interviews. Despite this emotionalism, Petitioner

appeared to be fine; he remained coherent and responsive to Detective Hartley's questions. (*Id.* at 70.) Petitioner looked defeated after he admitted to shooting Mr. Abdallah, but he was not so distraught that he was unable to continue an intelligent conversation. (*Id.* at 94, 97-98.)

There was additional evidence at trial that Petitioner was not under the influence of alcohol or controlled substances during his interviews and that he did not appear to be undergoing withdrawal from illicit drugs. The fact that he changed his story a couple of times when confronted with incriminating evidence is proof of his mental acuity. His medications, moreover, were dispensed to him in jail. (Tr. Nov. 4, 2005, at 127-28, 133-34, 137-40.) In fact, the prosecutor provided defense counsel with a log detailing when his medications were given to him. Because neither trial nor appellate counsel relied on this log during oral arguments in the trial court, the Michigan Court of Appeals concluded that Petitioner had failed to prove that he was not given his medication on a regular basis.

Trial counsel likely made a reasonable judgment that Petitioner's mental problems were under control at the time of his arrest and did not render his confession involuntary. To his credit, trial counsel focused on the fact that Petitioner was repeatedly questioned until he was physically and mentally exhausted. Counsel elicited testimony that one interview with the police was terminated because Petitioner was upset and not clear-minded. Counsel also pointed out that the police nevertheless interviewed Petitioner on subsequent days because they were not satisfied with his answers.

It would have been futile to argue that Petitioner was mentally ill and that his mental illness rendered his confession involuntary, given the testimony that Petitioner's behavior was

neither aberrant, nor incoherent, and that the police did not mistreat him. The trial court, in fact, specifically found the police officers' testimony credible on the issue of whether Petitioner's ability to respond to questions during the interview was hampered. The Court concludes that trial counsel's performance was not deficient and that the allegedly deficient performance did not prejudice the defense.

### 3. Failure to Investigate and Present Alibi Witnesses

Petitioner contends that his attorney failed to investigate and present an alibi defense. Petitioner maintains that his uncle and other people would have testified that he was at home at the time of the crime.

The Michigan Court of Appeals stated on review of this claim that the witnesses probably would not have provided helpful testimony for the defense because appellate counsel was unable to provide any affidavits. The Court of Appeals went on to say that, absent any affidavits describing the witnesses' testimony in any detail, Petitioner was unable to overcome his burden of proving that the failure to call and question the witnesses was sound trial strategy.

"A number of courts have found ineffective assistance of counsel in violation of the Sixth Amendment where . . . a defendant's trial counsel . . . fails adequately to investigate potential alibi witnesses." *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004) (collecting cases). When "asking whether counsel adequately investigated his client's defense, the ultimate inquiry is whether the choice not to conduct additional investigation was 'reasonable[ ] in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 691). "[C]ounsel

may 'draw a line when they have good reason to think further investigation would be a waste.'" *Id.* at 288 (quoting *Rompilla v. Beard*, 545 U.S. 374, 383 (2005)).

Petitioner's appellate attorney stated at a post-conviction hearing on Petitioner's motion for new trial that he had contacted the potential witnesses which Petitioner listed and that none of them provided any information that he could include in an affidavit. (Tr. Aug. 9, 2006, at 3.) If appellate counsel was unable to obtain any affidavits, trial counsel likely had the same problem with Petitioner's suggested list of alibi witnesses and made a reasonable decision not to investigate further. This conclusion is supported by the fact that Petitioner still has not submitted an affidavit from his uncle.

Petitioner has submitted an affidavit from his aunt, Joann Moore, who states that Petitioner could not have committed the crime because he was at home with family at the time of the victim's death. The affidavit, however, is dated September 5, 2007, twenty-two months after trial and more than two and a half years after the crime. Ms. Moore does not explain how she happened to remember the day in question, except to say that she was going to a bingo game in Windsor, Ontario that night.

Petitioner has not submitted any other affidavits from people who could have testified about his whereabouts on the night of the crime. Furthermore, his own confession to the police established that he shot Mr. Abdallah several times. The other evidence tended to corroborate his admissions. There is not a reasonable probability that the result of the trial would have been different had trial counsel produced Petitioner's aunt or other relatives in support of an alibi

defense. Consequently, Petitioner was not prejudiced by his attorney's alleged failure to investigate and produce alibi witnesses.

### IV.  Conclusion

The state appellate court's rejection of Petitioner's claims did not result in a decision that was contrary to Supreme Court precedent, an unreasonable application of federal law as determined by the Supreme Court, or an unreasonable determination of the facts.  Accordingly, the petition for writ of habeas corpus [Dkt. #1] is **DENIED**.

A certificate of appealability is **GRANTED** as to Petitioner's second claim regarding the voluntariness of his confession and his fourth claim regarding his trial attorney, because reasonable jurists could conclude that those issues are adequate to deserve encouragement to proceed further.  *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).  The Court declines to issue a certificate of appealability as to Petitioner's first and third claims regarding the weight and sufficiency of the evidence and the prosecutor's conduct and comments, because reasonable jurists would not debate whether those claims should have been resolved differently.  *See id*. Petitioner may proceed *in forma pauperis* on appeal without further authorization because he was granted *in forma pauperis* status in this Court.  Fed. R. App. P. 24(a)(3).


S/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge

Dated: November 30, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 30, 2010, by electronic and/or ordinary mail.

S/Catherine A. Pickles
Judicial Secretary